1

2

3                     UNITED STATES DISTRICT COURT

4                           DISTRICT OF NEVADA

5                                 * * *
                                        )
6   USACM LIQUIDATING TRUST and         )
    USA CAPITAL DIVERSIFIED TRUST        )
7   DEED FUND, LLC,                      )
                                        )           2:08-CV-00461-PMP-PAL
8               Plaintiffs,              )
                                        )
9   v.                                   )           ORDER
                                        )
10  DELOITTE & TOUCHE, LLP and           )
    VICTORIA LOOB,                       )
11                                       )
                Defendants.              )
12  _____ )

13          Presently before the Court is Defendant Deloitte & Touche LLP's Motion for

14  Summary Judgment (Imputation, In Pari Delicto, and Statute of Limitations) (Doc. #97),

15  filed on April 26, 2010.  Plaintiff filed an Opposition (Doc. #115) on June 7, 2010.

16  Defendant filed a Reply (Doc. #131) and Objections to Evidence (Doc. #133) on July 6,

17  2010.  Plaintiff filed a Response to the Objections (Doc. #141) on July 21, 2010.  Defendant

18  filed a Reply (Doc. #147) on August 4, 2010.

19          Also before the Court is Defendant Deloitte & Touche LLP's Motion to Exclude

20  Certain Opinions and Testimony of Colin Johns (Doc. #110), filed on June 4, 2010.

21  Plaintiff filed an Opposition (Doc. #129) on July 1, 2010.  Defendant filed a Reply (Doc.

22  #142) on July 22, 2010.

23          Also before the Court is Defendant Deloitte & Touche LLP's Motion for

24  Summary Judgment (Causation) (Doc. #111), filed on June 4, 2010.  Plaintiff filed an

25  Opposition (Doc. #126) on June 24, 2010.  Defendant filed a Reply (Doc. #138) and

26  Objections to Evidence (Doc. #140) on July 12, 2010.  Plaintiff filed a Response to the

Objections (Doc. #145) on July 26, 2010.  Defendant filed a Reply (Doc. #148) on August 4, 2010.

The Court held a hearing on these motions on August 30, 2010.  (Mins. of Proceedings (Doc. #149).)  The parties thereafter filed briefs regarding supplemental authority (Doc. ##151-54).

## I.  BACKGROUND

Plaintiff USACM Liquidating Trust ("Trust") is the successor-in-interest to USA Commercial Mortgage Company ("USACM") and USA Capital Diversified Trust Deed Fund, LLC ("DTDF").  (Decl. of Melanie M. Blunschi (Doc. #102) ["Blunschi Decl."], Ex. A at 56-57.)  USACM filed for bankruptcy on April 13, 2006.  (Decl. of Geoffrey L. Berman (Doc. #116).)  The Trust was created pursuant to the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization ("Joint Plan"), which became effective March 12, 2007.  (Id.)  Under the Joint Plan, the Trust obtained the right to enforce USACM's causes of action.  (Id.)  The Trust brings the current action against USACM's former outside auditor, Defendant Deloitte & Touche LLP ("Deloitte").  The Trust generally contends that if Deloitte had not issued unqualified audit opinions for fiscal years 2000 and 2001,[1] USACM insiders could not have engaged in two allegedly fraudulent schemes which ultimately resulted in millions of dollars in losses.

USACM was incorporated in Nevada in February 1989 by Thomas A. Hantges ("Hantges") and David Berkowitz.  (MSJ[2] ¶ 4.)  In 1995, Hantges became USACM's sole

---

[1]  The Trust no longer is pursuing claims related to the 1998 and 1999 audit opinions.  (Stip. Regarding Scope of Pl.'s Claims (Doc. #96).)

[2]  Defendant Deloitte set forth in its Motion for Summary Judgment numbered paragraphs of undisputed facts.  The Trust agrees that paragraphs 1-6, 11-14, certain parts of 15-16, and 17-19 are undisputed. (Pl. USACM Liquidating Trust's Resp. to Def. Deloitte & Touche LLP's Mot. for Summ. J. (Doc. #115) at 5.)  The Court therefore will cite to these paragraphs as "MSJ" with the relevant paragraph number.

shareholder.  (MSJ ¶ 5.)  In 1997, Joseph D. Milanowski ("Milanowski") acquired USACM stock from Hantges.  (MSJ ¶ 6; Blunschi Decl., Ex. K at 42-43.)  From May 1998 until its demise, Hantges and Milanowski together never owned less than eighty-three percent of USACM's stock.  (MSJ ¶ 6.)  The only other stockholders included Paul Hamilton ("Hamilton") and Jamie Wise ("Wise").  Hamilton obtained a five percent interest in USACM in 1999, but was not a board member at any time.  (Blunschi Decl., Ex. K at 49, Ex. X at 10-11, 38-39.)  Hamilton held the title of managing director, but it was only an honorary title and Hamilton did not consider himself a member of USACM's management.  (Blunschi Decl., Ex. K at 49, Ex. X at 38, 50.)  In May 2006, Hamilton transferred his five percent interest in USACM to Milanowski.  (Blunschi Decl., Ex. W.)

Wise was Hantges' wife until the couple divorced in 2003.  (Blunschi Decl., Ex. U at 24.)  In January 2000, Hantges transferred eight percent of his stock to Wise's separate property trust.  (Blunschi Decl., Ex. S at 91-92, Ex. U at 7-8.)  In 2001, Wise signed documents gifting five of her twenty shares to Hantges and the other fifteen shares to Red Granite, LLC.  (Blunschi Decl., Ex. S at 93-94, Ex. U at 8-9.)  At the time Wise re-gifted the shares back to Hantges in 2001, Hantges owned 48% of USACM, Milanowski owned 38%, Red Granite owned 8%, and Hamilton owned 5%.  (Blunschi Decl., Ex. Z.)  Wise initiated divorce proceedings in May 2002.  (Blunschi Decl., Ex. U at 7.)  Wise testified that although she signed the documents relating to the gifting of these shares, she did not recall doing so, and she frequently signed papers provided by Hantges relating to USACM without reading them.  (Id. at 9.)  Wise testified she did not learn of the USACM stock transfers until her divorce.  (Id. at 8.)  Wise was not a board member at any time.  (Id. at 27.)

USACM's board consisted of Hantges as USACM's Chairman and CEO, Milanowski as President and Treasurer, and Victoria Loob ("Loob") as Secretary.  (Blunschi Decl., Ex. J, Ex. K at 42-43.)  In 2001, Eugene Buckley ("Buckley") was named

as a member of USACM's board in connection with a five million dollar loan he made to a related entity owned by Hantges and Milanowski.  (Blunschi Decl., Ex. K at 46-47.) Buckley did not participate in any formal board meetings at USACM, but Milanowski and Hantges met with Buckley for informal meetings.  (Id. at 46-48.)  However, Buckley did not participate in managing USACM.  (Id. at 48-49.)  Buckley described himself as a "figurehead," and the only board of directors meeting he attended was the one at which he resigned in September 2004.  (Blunschi Decl. Ex. AA at 66-68, 107.)

USACM was in the business of originating loans to real estate borrowers provided by direct lenders and servicing the loans it originated by collecting principal and interest from the borrowers and distributing those payments to the direct lenders.  (MSJ ¶ 5; Blunschi Decl., Ex. P.)  USACM primarily obtained revenue through loan origination and servicing fees.  (Blunschi Decl., Ex. K at 56.)  USACM also sometimes invested in development projects, including some that USACM originated and serviced.  (Id. at 58.) USACM's original business model consisted of matching direct lenders to borrowers whereby each lender had a partial interest in both the loan and the underlying security for each loan.  (MSJ ¶ 12.)  In 1998, USACM set up two accounts, one to collect deposits by investors and lenders, and the other to collect interest and principal payments by borrowers ("Collections Trust Account").  (MSJ ¶ 14.)

In 1999, Hantges and Milanowski formed a separate entity, USA Investment Partners ("USAIP").  (MSJ ¶ 15.)  USAIP was a holding company for other entities engaged in land acquisition and real estate development, along with other non-real estate related investments.  (Id.)  Hantges and Milanowski owned and controlled USAIP, and were USAIP's officers and directors.  (Id.)

In 2001, USACM adopted a second business model which allowed investors to purchase interests in investment funds, and the investment funds then acted as at least one of the lenders in the loan originated and serviced by USACM.  (MSJ ¶ 17.)  To facilitate

this business model, Hantges and Milanowski formed two investment funds, DTDF, and First Trust Deed Fund ("FTDF").  (Id.)  Establishment of these funds coincided with a drastic increase in the number of loans USACM originated from 2001 through 2005.  (MSJ ¶ 18; Blunschi Decl., Ex. K at 63.)

According to the Trust, Hantges and Milanowski developed two fraudulent schemes to misappropriate USACM's service fees and funds in the two trust accounts for their own purposes.  First, the Trust contends Hantges and Milanowski transferred vast sums of money from USACM into USAIP and other entities owned by Hantges and Milanowski without any obligation to do so on USACM's part, and without any corresponding benefit to USACM.  For example, USACM made advances to HMA Sales either directly or through USAIP to support the operations of HMA Sales.  (Decl. of J. Maxwell Beatty (Doc. #119) ["Beatty Decl."], Ex. P at 180-81.)  These transfers provided no benefit to USACM's loan origination or servicing business.  (Id. at 181.)  USACM had no obligation to make these advances, and it never had any ownership interest in HMA Sales.  (Id.)  The advances were non-interest bearing and thus as to USACM there was no upside in advancing money to HMA Sales.  (Id. at 182.)  However, USAIP stood to gain substantial profits and any potential upside to the advances inured to USAIP's benefit.  (Id. at 182-83; see also id. at 180 (TJA Marketing); 183-85 (Twelve Horses).)  USACM made many advances to USAIP which were not interest bearing.  (Id. at 204-05.)  USACM had no ownership interest in USAIP, and thus had no obligation to advance any funds to USAIP, and had no right to share in USAIP's profits on these ventures.  (Id. at 205.)

Second, the Trust contends Hantges and Milanowski engaged in a "Ponzi-like" scheme by which they used new incoming investor funds to cover interest and principal payments to other investors who owned an interest in non-performing loans.  The Trust contends Hantges and Milanowski did so to encourage both continued investment by current lenders as well to attract new investors to keep money flowing into USACM

5

which they could continue to divert to their other entities, such as USAIP.  USACM bought out direct lenders' interests on loans where the borrower was in default, and paid direct lenders principal and interest even if the underlying borrower had not made the corresponding payment, because it was better for USACM's business to be able to raise money in the future if it could tell investors that USACM's investors never lost money. (Blunschi Decl., Ex. K at 91, Ex. S at 164.)  According to Milanowski, this was a business decision intended to benefit USACM.  (Blunschi Decl., Ex. K at 91.)  As loans defaulted at a higher rate, USACM began to withhold payments to direct lenders, including DTDF, because there were not enough funds in the Collections Trust Account to cover payments to lenders on non-performing loans.  (Beatty Decl., Ex. P at 283-85.)  For example, in 2002, USACM withheld $7 million in principal and interest from DTDF.  (Beatty Decl., Ex. T.) USACM's payments on defaulted loans allowed USACM to claim that no direct lender ever failed to receive a payment, thus encouraging further investment to provide fresh capital into USACM.  (Blunschi Decl., Ex. A at 69-70.)  Indeed, investors continued to invest funds up to the date of USACM's bankruptcy.  (Id.)

Defendant Deloitte performed year-end audits for USACM for fiscal years 1998 through 2001, completing the last audit for fiscal year 2001 on November 26, 2002. (Blunschi Decl., Exs. B-E.)  For each year Deloitte worked as USACM's auditor, it issued unqualified audit opinions and certified that USACM's financial statements were fairly stated.  (Id.)  After completing the 2001 year-end audit, Deloitte withdrew as USACM's auditor in January 2003.  (MSJ ¶ 2.)  Following Deloitte's withdrawal, the firm Piercy Bowler Taylor & Kern PC performed USACM's audits for fiscal years 2002 through 2005. (Id.)

USACM was subject to Nevada state regulatory oversight by the Nevada Financial Institutions Division ("FID"), now the Mortgage Lending Division.  FID examined USACM each year from 1999 to 2004.  (Decl. of Sheila Walther (Doc. #99)

["Walther Decl."] at 1 & Exs. 3, 4, 5.)  FID's examinations of USACM identified a number of deficiencies over the years and FID expressed concerns about USACM's ability to meet the requirement that it have a net worth of $250,000 due to the substantial number of related and affiliated party transactions.  (Id.)  Despite finding numerous violations each year, FID only fined USACM $4,000 in April 1999 for various violations, and fined USACM for unapproved advertising in March and November 2000, and July 2001, resulting in fines of $1,000, $3,000, and $2,000 respectively, but took no other actions to suspend or revoke USACM's license.  (Blunschi Decl., Ex. C; Sealed Decl. of Melanie Blunschi (Doc. #103), Ex. NN.)

Payments on non-performing loans eventually outpaced incoming investments and USACM filed for bankruptcy on April 13, 2006.  (Decl. of Geoffrey L. Berman (Doc. #116).)  In August 2009, Milanowski pled guilty to wire fraud.  (Request for Judicial Notice (Doc. #100), Ex. 6; Blunschi Decl., Ex. L.)  The guilty plea was based on Milanowski's involvement in the creation of the "10-90 loan," a loan which violated DTDF's prospectus because it was to an insider and because it was not secured by real property.  (Blunschi Decl., Ex. L.)  Additionally, despite disclosure requirements, Milanowski concealed the over $22 million associated with the 10-90 loan until September 2005, at which time DTDF claimed the loan was secured by three master-planned communities in California when it was not.  (Id.)  As part of his plea agreement, Milanowski agreed to cooperate with the Trust.  (Blunschi Decl., Ex. K at 33-34, Ex. L.)

The Trust brought this action on April 11, 2008, asserting claims against Deloitte for aiding and abetting a breach of fiduciary duty (count one), professional malpractice (count two), and breach of contract (count three).  Deloitte now moves for summary judgment, arguing the Court must impute to USACM the actions and knowledge of USACM's agents, Hantges and Milanowski.  Deloitte contends that once Hantges' and Milanowski's conduct and knowledge is imputed to USACM, Deloitte is entitled to

summary judgment under the doctrine of in pari delicto, because USACM cannot sue Deloitte for failing to stop USACM from engaging in its own fraudulent conduct.  Deloitte also argues that because Hantges' and Milanowski's knowledge must be imputed to USACM, USACM knew of any alleged failures by Deloitte no later than January 2003, when Deloitte completed its last audit and withdrew from representing USACM in the future.  Deloitte thus contends the statute of limitations has run on the Trust's claims.  Deloitte further contends that even without imputation, the Trust's claims related to the fiscal year 2000 audit are time-barred under the applicable statute of repose.

The Trust responds that imputation should not apply because Hantges and Milanowski were not acting within the scope of their authority when they violated the law.  The Trust further responds that the adverse interest exception to imputation applies because Hantges and Milanowski were acting in their own interests, not USACM's interest, when they engaged in the alleged fraudulent schemes.  The Trust also contends that even if imputation applies, the Court should not impute Hantges' and Milanowski's knowledge and conduct to the Trust for public policy reasons.  As to the statute of limitations, the Trust argues the limitations period is tolled because Deloitte concealed its malpractice, and the adverse domination exception applies.  The Trust also argues that aiding and abetting a breach of fiduciary duty is subject to a three year limitations period.

**II.  LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir.

2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

## III.  IMPUTATION

Under Nevada law, the knowledge of an officer or agent is imputed to the corporation when the agent obtains the knowledge "while acting in the course of his employment and within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation."  Strohecker v. Mut. Bldg. & Loan Ass'n of Las Vegas, 34 P.2d 1076, 1077 (Nev. 1934) (quotation omitted); see also Bates v. Cottonwood Cove Corp., 441 P.2d 622, 624 (Nev. 1968); Restatement (Third) of Agency § 5.03.  This is so because a corporation can acquire knowledge or receive notice only through its officers and agents, and the law presumes that an agent will disclose all information to its principal.  Strohecker, 34 P.2d at 1077; In re 1031 Tax Group, LLC, 420 B.R. 178, 199 (Bankr. S.D.N.Y. 2009).

Further, a corporation is "responsible for the acts of its authorized agents even if particular acts were unauthorized," because the "risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent."  Kirschner v. KPMG LLP, 938 N.E.2d 941, 950-51 (N.Y. 2010) (quotation omitted).  Thus, "where conduct falls within the scope of the agents' authority, everything they know or do is imputed to their principals."  Id. at 951 (stating that "everyday activities central to any company's operation and well-being-such as issuing financial statements, accessing capital markets, handling customer accounts, moving assets between corporate entities, and entering into contracts" constituted conduct within the scope of a corporate officer's authority); see also In re Parmalat Sec. Litig., 659 F. Supp. 2d 504, 518 (S.D.N.Y. 2009) (stating that the

"preparation, approval and oversight of financial statements are ordinary functions of management" which typically would be attributed to the company).

However, an agent's knowledge will not be imputed to the corporation when the agent is acting on his own behalf and not on behalf of the corporation. Keyworth v. Nev. Packard Mines Co., 186 P. 1110, 1113 (Nev. 1920). This is commonly referred to as the "adverse interest" exception to the usual rule that an officer's or director's acts and knowledge are imputed to the corporation.

Nevada has not indicated whether an agent's interest must be completely adverse to its principal to invoke the adverse interest exception. "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007) (quotation omitted). "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions." Id. (quotation omitted).

Other jurisdictions would require an agent to completely abandon the principal's interests and act entirely for his own purposes. See, e.g., In re CBI Holding Co., Inc., 529 F.3d 432, 448 (2d Cir. 2008); In re Bennett Funding Group, Inc., 336 F.3d 94, 100 (2d Cir. 2003) (indicating adverse interest exception applies only when the agent has "totally abandoned" the principal's interests); In re Crazy Eddie Secs. Litig., 802 F. Supp. 804, 817 (E.D.N.Y. 1992) (stating that when the agent acts both for himself and for the principal, the agent's knowledge is imputed to the principal even if the agent's primary interest is inimical to the principal). According to Fletcher's Cyclopedia of the Law of Private Corporations, the agent's relations to the subject matter must be "so adverse as practically to destroy the relation of agency." 3 Fletcher Cyclopedia of Private Corp. § 789. Courts generally require total abandonment to invoke the adverse interest exception because "[t]his rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this

most narrow of exceptions for those cases-outright theft or looting or embezzlement-where the insider's misconduct benefits only himself or a third party . . . ." <u>Kirschner</u>, 938 N.E.2d at 952.  Based on these authorities, the Court concludes, as it has previously, that Nevada would adopt a similar rule.  <u>See</u> <u>In re Agribiotech, Inc.</u>, No. CV S 02 0537 PMP(LRL), 2005 WL 4122738, *10 (D. Nev. April 1, 2005) (unpublished).

In determining whether an agent acted adversely to its principal, courts have distinguished between a fraud committed for the benefit of the corporation, as opposed to a fraud against the corporation.  "Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong."  <u>F.D.I.C. v. Ernst & Young</u>, 967 F.2d 166, 171 (5th Cir. 1992) (quotation omitted).  "But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud . . . [and] the primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud . . . ."  <u>Id.</u> (quotation omitted); <u>see also</u> <u>Cenco, Inc. v. Seidman & Seidman</u>, 686 F.2d 449, 456 (7th Cir. 1982).

Courts make this distinction between fraud by the corporation versus fraud against the corporation because the law will not presume that an agent engaged in a scheme to defraud his principal would advise his principal of information that would uncover his fraud.  <u>In re CBI Holding Co., Inc.</u>, 529 F.3d at 448.  The "classic example" of an agent acting adversely to his principal is where an agent embezzles from or loots his principal. <u>Baena v. KPMG LLP</u>, 453 F.3d 1, 8 (1st Cir. 2006); <u>see also</u> <u>In re Parmalat Sec. Litig.</u>, 659 F. Supp. 2d at 518 (noting that theft by officers from their own company was not imputable to their employer).

Some courts have determined that the question of whether an agent was acting adversely to its principal was a fact question even if the principal obtained a short term

benefit, where the evidence was capable of supporting the conclusion that any benefit to the principal "was intended to redound to the advantage of only the [agents] and their conspirators." In re Crazy Eddie Sec. Litig., 802 F. Supp. at 817-18.  For example, one court has held that where the agent embezzled from his principal and put some of the embezzled money back into the corporation "to help inflate sales and facilitate public offerings," a reasonable jury could find the agent abandoned the corporation's interest even though the corporation received some benefits.  Id.; see also In re Sunpoint Sec., Inc., 377 B.R. 513, 565 (Bankr. E.D. Tex. 2007) (concluding that the agent completely abandoned his principal's interests even though he occasionally infused the principal with funds because "such infusions were incidental and never intended for the benefit of [the principal], but rather were intended to preserve one of the mechanisms by which [the agent] could access large amounts of cash for his personal use.  Any economic advantage enjoyed or realized by [the principal] for any reason was subject to immediate appropriation by [the agent] for his own personal benefit.").  In contrast, other courts have determined that "[s]o long as the corporate wrongdoer's fraudulent conduct enables the business to survive-to attract investors and customers and raise funds for corporate purposes," the adverse interest test is not met.  Kirschner, 938 N.E.2d at 953.

The "adverse interest" exception is itself subject to an exception where the agent is the sole representative of the principal corporation.  In re NM Holdings Co., LLC, 622 F.3d 613, 620-21 (6th Cir. 2010) (stating that the sole actor rule applies where the wrongdoing agent "is, in essence, the corporation (the 'sole actor')"); 3 Fletcher Cyclopedia of Private Corp. § 789.  "The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability."  In re Personal & Bus. Ins. Agency, 334 F.3d 239, 243 (3d Cir. 2003) (quotation omitted).  Indeed, it would be "nonsensical to refrain from imputing the agent's

acts of fraud to the corporation, despite the agent's total abandonment of the corporation's interests, because the agent is identical to the corporation." In re CBI Holding Co., Inc., 311 B.R. 350, 373 (S.D.N.Y. 2004). Consequently, "where the wrongdoer is a sole actor, the adverse interest exception is not applied and his wrongdoing is nevertheless imputed to the corporation," even where the sole actor loots the corporation. In re NM Holdings Co., LLC, 622 F.3d at 621 (quotation omitted).

The sole actor rule is most easily applied when the wrongdoer was also the corporate principal's sole shareholder or when all the corporation's management participated in the wrongdoing. In re CBI Holding Co., Inc., 311 B.R. at 373. However, courts have struggled with determining whether and under what circumstances the sole actor rule should apply when not every shareholder or officer was involved in the fraud, and what impact the presence of so-called "innocent decision-makers" should have on the inquiry. Some jurisdictions reject the idea that the presence of innocent decision-makers has any relevance to the imputation inquiry. Baena v. KPMG LLP, 453 F.3d 1, 8-9 (1st Cir. 2006) (finding Massachusetts would not adopt an innocent decision-maker exception, stating it "clearly deviates from traditional agency doctrine; a company president who engages in price-fixing leaves his corporation liable even if the board of directors, had it known, would have stopped him"). Some have characterized the question as whether "all relevant shareholders and/or decisionmakers were involved in the wrongful conduct, or if there is otherwise sufficient unity between the corporation and defendant to implicate the corporation itself, rather than just its agents." Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen L.L.P., 175 F. Supp. 2d 1180, 1199 (D. Ariz. 2001) (quotations omitted). Others have considered whether the corporation "bestow[ed] upon its agent unfettered control and allow[ed] the agent to operate without meaningful supervision with respect to a particular type of transaction." Breeden v. Kirkpatrick & Lockhart, LLP, 268 B.R. 704, 709-10 (S.D.N.Y. 2001) (stating that sole actor rule should apply "where the

13

corporation delegates all authority over a portion of its business to a particular manager or managers").

Still others have focused on the question of control over the company, and have concluded that if an "innocent person inside the corporation had the power to stop the fraud, the agent and the company are not mere alter egos, so the sole actor rule cannot apply." In re 1031 Tax Group, LLC, 420 B.R. at 202-03; In re CBI Holding Co., Inc., 311 B.R. at 373 ("When the innocent insiders lack authority to stop the fraud, the 'sole actor' exception to the 'adverse interest' exception applies, and imputation is thus proper, because all relevant shareholders and decisionmakers were involved in the fraud."). These courts require that the innocent insider both could have and would have stopped the wrongdoing had they become aware of it. In re 1031 Tax Group, LLC, 420 B.R. at 205. This showing is not met by a "would-a, could-a, should-a test." In re Bennett Funding Group, Inc., 336 F.3d at 101. Moreover, the "hope or even expectation that some honest employee with knowledge of the fraud would report the matter to law enforcement authorities" will not suffice. In re 1031 Tax Group, LLC, 420 B.R. at 205. Rather, the innocent insider must have "actual corporate power or authority" to stop the fraud. Id.; see also In re Bennett Funding Group, Inc., 336 F.3d at 101 (noting the innocent insider exception did not apply because the "so-called independent" directors were "impotent to actually do anything").

Nevada has not addressed whether it would recognize an exception to the sole actor rule based on the existence of an innocent decision maker. To the extent some courts have fashioned an innocent insider exception to imputation or in pari delicto, as opposed to the sole actor rule, the Court concludes Nevada would not follow those decisions. Instead, the Court concludes that to the extent Nevada would adopt the innocent decision maker exception at all, it would follow those courts which have held that the existence of innocent insiders is relevant only to determine whether the sole actor rule applies, and thus comes into play only upon an initial finding that the wrongdoer acted adversely to his principal.

14

Agency theory typically imputes an agent's wrongful acts to his principal regardless of the presence of innocent insiders "unless the agent totally abandoned the interests of the principal and was acting in his own self-interest (i.e. the adverse interest exception applies)." In re 1031 Tax Group, LLC, 420 B.R. at 202-03; In re CBI Holding Co., Inc., 311 B.R. at 373. "But, if innocent decision makers exist within the company with authority to stop the fraud, the company and the agent are not the same entity, so the sole actor rule cannot apply." In re 1031 Tax Group, LLC, 420 B.R. at 203.

The Court further concludes that if Nevada would adopt the innocent decision maker exception at all, Nevada would require the innocent insider to have actual corporate authority to stop the fraud. Because the relevant question is whether the corporation and the wrongdoing agent are one and the same, resort to coercive power outside the corporate structure does not demonstrate a lack of unity between the agent and the corporation. Indeed, it suggests the innocent decision makers lack the power within the corporate structure to stop the fraud, and thus the wrongdoing agents are the sole relevant corporate actors. See In re NM Holdings Co., LLC, 411 B.R. 542, 550 (E.D. Mich. 2009) (concluding that outside creditors' "coercive power" did not show that the agent and his principal were "distinct entities such that [the agent] did not have total control over the company (i.e., was the sole actor) for the purposes of the relevant transactions"); Grede v. Bank Of N.Y., No. 08 C 2582, 2009 WL 1657578, *4 (N.D. Ill. 2009) (unpublished) (stating the "existence of an innocent authority-lacking employee willing to blow the whistle does not sever the unity of the guilty insiders and the corporation").

Instead, courts have required evidence that the innocent insider could and would have exercised corporate authority to stop the fraud. For example, in In re Friedman's Inc., the corporate principal had created a special committee of independent directors, innocent of any wrongdoing, that had the discretionary authority to decide whether the corporation would make the challenged investment. 394 B.R. 623, 633 (S.D. Ga. 2008). Because the

committee of innocent decision makers "possessed the authority to prevent this transaction," the court concluded the sole actor rule did not apply.  Id.  Similarly, in In re Sharp International Corporation, the shareholders agreement gave the innocent insider a seat on the board of directors which the wrongdoers could not take away, membership on the compensation committee, and "the power to veto all significant corporate transactions." 319 B.R. 782, 788-90 (Bankr. E.D.N.Y. 2005).  Additionally, the wrongdoers testified that they thought the innocent insider was "capable of putting a stop the fraud and therefore took pains to conceal it from him."  Id.

In contrast, where the wrongdoers had "ultimate decision making authority on all issues of significance," the company's only two shareholders delegated "unfettered control" of the company's financial operations to their son who was engaged in the fraudulent scheme, and other employees served at the pleasure of the wrongdoers, the court concluded the innocent decision maker exception did not apply.  Breeden v. Kirkpatrick & Lockhart, LLP, 268 B.R. 704, 710-14 (S.D.N.Y. 2001).  Of particular importance was the fact that no one identified as an innocent insider had real, as opposed to nominal, authority within the company.  Id.  Although one individual held the title of treasurer, he "had no responsibilities with respect to cash flow or bank accounts and was ignorant of the company's cash disbursement process."  Id. 712-13.  Another person who was a director and member of the executive committee "admitted he was a mere public relations figurehead who did not have any responsibilities."  Id. at 713 (quotations omitted).

Further, when asked what the witnesses would have done had they uncovered the fraud, none indicated they would have confronted the wrongdoers.  Id.  Instead, they "speculated that if given definitive evidence of fraud they likely would have approached an attorney to determine the proper course of action."  Id.  However, none of the innocent insiders could say what the attorney may have advised them to do and "no attorney was called at the hearing or submitted any affidavit indicating that he did or would give such

advice." Id.  Moreover, when actually presented with evidence of the fraud, "not one of these individuals did anything to alert the company's counsel, outside auditors, or government authorities."  Id. at 714.

In sum, Nevada recognizes the well-accepted rule that an agent's knowledge and acts are imputed to his principal, unless the agent acts adversely to his principal.  The Court concludes that Nevada would require the agent to totally abandon his principal's interest for the adverse interest exception to apply, and that an agent most clearly does so when he loots or steals or embezzles from his principal.  The Court further concludes that Nevada would adopt the recognized and uncontroversial proposition that even where agents act adversely to their principal, their knowledge and acts still will be imputed to the principal if they are the sole relevant actors.  Finally, the Court concludes that to the extent Nevada would adopt an innocent decision maker exception, it would do so as a corollary to the sole actor rule and not as an independent exception to imputation.  Rather, assuming without deciding that Nevada would find the presence of innocent decision makers relevant, Nevada would inquire whether any innocent insider existed who could and would have exercised actual corporate authority to stop the fraud such that there is no unity between the wrongdoing agents and their corporate principal.

Here, Hantges and Milanowski were acting in the course of their employment and within the scope of their authority.  The movement of corporate assets and decisions about which investments to make, which creditors to pay, and what information to disclose are ordinary functions of management which typically would be attributed to the company.  The Trust's argument that because Hantges and Milanowski performed illegal acts, they acted outside the scope of their authority would eviscerate the imputation rule.  Were the Trust suing USACM on behalf of third parties, it no doubt would argue that USACM could not escape liability for its agents' acts simply because in the course of performing acts within the scope of their employment and authority, they committed illegal or fraudulent acts.

Corporations cannot insulate themselves from liability simply by proclaiming that their agents are not authorized to commit illegal acts, and thus any such acts are not imputable to the corporation.

Hantges' and Milanowski's acts and knowledge therefore are imputed to USACM, and thus to the Trust which stands in USACM's shoes, unless the adverse interest exception applies.  The Court will assume, without deciding, that the Trust has presented evidence raising a genuine issue of material fact that the adverse interest exception applies to at least some of the challenged conduct.  However, no genuine issue of material fact remains that Hantges and Milanowski were USACM's sole relevant actors, such that even if a reasonable jury could find they acted adversely to their principal, their knowledge and conduct still would be imputed to USACM and the Trust.  The Trust has identified various individuals who it contends qualify as innocent insiders, including the two innocent shareholders, Wise and Hamilton; the innocent director Buckley; innocent employees, including USACM's in-house counsel Tom Rondeau, USACM's chief financial officer Robert Hilson, USACM's vice president of investments Phillip Dickinson, and USACM's vice president of permanent finance Devin Lee; and the outside regulatory agency, FID.

No genuine issue of material fact remains that the two innocent shareholders do not qualify as innocent decision makers severing the unity between USACM and Hantges and Milanowski.  Hantges and Milanowski owned the vast majority of USACM stock.  Hantges was USACM's Chairman and CEO, and Milanowski was President and Treasurer.  According to Milanowski, he and Hantges had ultimate decision-making authority for all decisions at USACM and no one had authority to override their decisions, including Hamilton or Wise.  (Blunschi Decl., Ex. K at 45-46.)  Loob likewise testified that Hantges and Milanowski controlled USACM, and she could not recall a decision of theirs ever being overturned by anyone else.  (Blunschi Decl., Ex. N at 118, 176-77, 186.)

///

Hamilton testified that although he was given the title of managing director, it was just an honorary title, and he did not consider himself a member of USACM management. (Blunschi Decl., Ex. X at 38, 50.) He was not an officer, director, or member of the board. (Id. at 38-39.) Further, he testified that as a shareholder he did not feel he had the ability to override a decision made by Hantges or Milanowski, and he did not recall anyone ever overriding a decision made by Hantges or Milanowski. (Id. at 42-43.) Hamilton denied he had authority to stop Hantges or Milanowski from taking money from USACM. (Id. at 60.) When asked whether he would have reported it to the Securities and Exchange Commission ("SEC") had he learned of fraud at USACM, Hamilton responded, "I'm not sure what I would have done back then," and he "did not know" whether he would have told the FID. (Blunschi Decl. in Support of Mot. for Summ J. (Causation) (Doc. #114), Ex. 30 at 18, 20.) Although the Trust contends Hamilton could have resorted to Nevada law to enforce his rights as a shareholder, Hamilton never expressed that he could or would have taken such action. Instead he testified to the opposite, that he did not believe that as a shareholder he could have overridden any decision made by Hantges or Milanowski.

Wise testified that if Deloitte had told her in 2002 that there were illegalities or fraud committed by USACM management, she would have told her attorney and possibly the accountant hired by her attorney, to protect her interests. (Maxwell Decl, Ex. A at 15-16.) Wise was involved in a contentious divorce with Hantges at the time, and thus there is some basis beyond mere speculation to believe that she would have advised her attorney of the matter. Further, Rondeau sent a memo to Milanowski in 2005 regarding other alleged misconduct by Hantges in which he expressed the concern that if Wise brought the matter to her attorney's attention, the "grief that could cause I'd rather not contemplate." (Beatty Decl., Ex. W.) The Trust sets forth various actions which Wise and her attorney could have taken, however, the Trust presents no evidence from Wise's

1   attorney as to what he would have done that could have stopped the fraud.

2          Instead, the Trust offers various possible avenues Wise and her attorney could

3   have taken, such as resort to Nevada state law remedies for shareholders.  While some

4   courts have indicated that resort to state law remedies for shareholders would suffice to

5   show an innocent shareholder could have stopped the fraud, the Court questions this

6   conclusion.  The fact that the innocent shareholder must sue and invoke the coercive power

7   of the courts to stop the fraud suggests that the corporation and its wrongdoing agents are

8   unified such that imputation would be appropriate.  However, even if resort to state law

9   remedies would suffice, the Trust has not presented evidence that Wise, through her

10  attorney, would have resorted to those remedies.  The Trust presents evidence only that

11  Wise would have reported it to her attorney, and then the Trust suggests avenues for relief

12  Wise's attorney could have pursued.  The Trust failed to present any evidence as to what

13  steps Wise's attorney would have taken on Wise's behalf that would have stopped the fraud.

14         The Trust next identifies the only innocent director at USACM, Buckley.

15  Buckley nominally was a director of USACM, but he described himself as a "figurehead."

16  (Blunschi Decl., Ex. AA.)  Milanowski and Hantges had ultimate decision-making authority

17  for all decisions at USACM, and Buckley did not have any authority to override their

18  decisions.  (Blunschi Decl., Ex. K at 45-46.)  Buckley did not take an active role on the

19  board and played no role in USACM's management.  (Blunschi Decl., Ex. S at 128.)

20  Buckley testified that Hantges and Milanowski would have board meetings without him,

21  and he was not involved in those meetings.  (Blunschi Decl., Ex. K at 67-68.)  The only

22  board meeting he attended was the one he where he resigned.  (Id. at 107.)  Under

23  USACM's bylaws, there was no way to have a quorum of the board without the

24  participation of either Hantges, Milanowski, or both.  (Blunschi Decl., Ex. S at 122.)

25  According to Rondeau, Hantges and Milanowski did not see the point of holding annual

26  board meetings because "they knew darned well they were in control of everything and

everything was ratified by them as long as they did it." (Id. at 123.)

Buckley testified that if he had learned of fraudulent or illegal activity at USACM while he was a director, he would made an effort to stop it, and he would have told investors. (Maxwell Decl. (Doc. #127), Ex. S at 14-15, Ex. T at 109.) Buckley's statement that he would have done something to stop the fraud, without any factual specificity, does not raise a genuine issue of fact that he actually would or could have done anything to stop the fraud. Buckley's statement that he would have told investors also does not raise an issue of fact that the unity between USACM and Hantges and Milanowski should be severed. The fact that Buckley would have told outside parties, the investors, about the fraud, does not suggest that Buckley had any authority within the corporate structure to stop the fraud, and instead suggests the opposite. The fact that third party investors may have ceased funding USACM, and thereby stopped the fraud as a practical matter by cutting off Hantges' and Milanowski's source of funds, does not raise an issue of fact that Hantges and Milanowski were not the sole relevant actors at USACM.

The Trust refers to a provision of Nevada law to suggest Buckley would have controlled USACM as its only disinterested director voting on transactions in which other directors were interested. However, the statutory section on which the Trust relies governs when a transaction involving an interested officer or director is void or voidable. See Nev. Rev. Stat. § 78.140. Section 78.140 does not require that prior to entering into such a transaction, officers or directors must present the transaction to either the shareholders or disinterested directors for approval. It merely provides the circumstances under which such transactions may be prevented from being deemed void or voidable.

The Trust also fails to present evidence raising a genuine issue of material fact that any of the identified employees had sufficient corporate authority to stop the fraud and would have done so had they known about it. According to Milanowski, he and Hantges had ultimate decision-making authority for all decisions at USACM and in-house counsel

Rondeau did not have authority to override their decisions.  (Blunschi Decl., Ex. K at 45-46.)  Rondeau was named executive vice president in April 1999.  (Blunschi Decl., Ex. S at 9-10.)  According to Rondeau, he was made executive vice president in the event Hantges and Milanowski were unavailable and something needed to be signed.  (Id. at 10.) Rondeau estimated he signed on Hantges' and Milanowski's behalf perhaps three or four times in seven years.  (Id. at 11.)  Although he had signature authority, Rondeau testified that it was "understood" that Rondeau "was not going to sign anything without [Hantges' and Milanowski's] knowledge, consent and approval, of course."  (Id. at 58.)  Rondeau reported to Hantges and Milanowski.  (Id. at 71.)  According to Rondeau, as a practical matter, Hantges and Milanowski controlled USACM.  (Id. at 75.)

Rondeau recognized his duties to USACM were separate from, and may come in conflict with, Hantges' and Milanowski's interests.  For example, in a January 2005 memo to Milanowski, Rondeau indicated the need to inform shareholders regarding alleged misconduct by Hantges.  (Beatty Decl., Ex. W.)  In that memo, Rondeau stated that his "client is USACM and its interest diverge here from [Hantges' and] (maybe [Milanowski's]?)."  (Id.)  However, there is no evidence Rondeau followed through by making any such disclosure.

Moreover, when questioned regarding what he would have done if he had learned of the fraud, Rondeau gave varying answers.  At times he indicated he would have reported any material fraud to FID.  (Beatty Decl., Ex. C at 30; Decl. of Melanie Blunschi in Support of Reply (Doc. #132) ["Blunschi Reply Decl."], Ex. ZZ at 30.)  Other times he indicated that he could not speculate what he would have done.  (Blunschi Reply Decl., Ex. ZZ at 28) Still other times, he indicated that all he wanted to do was get out of the situation and not "pursue" it.  (Blunschi Decl., Ex. S at 60; Beatty Decl., Ex. C at 24.)

More telling is what Rondeau actually did when in fact he suspected the fraud associated with the 10-90 loan.  Rondeau resigned in September 2005 without alerting the

shareholders, investors, SEC, FID, or other law enforcement agencies.  (Blunschi Decl., Ex.

S at 17.)  Rondeau stated that at that point, the SEC was involved and that--

> it was pretty apparent to me that, you know, although every detail
> wasn't out, you know, generally people were aware of what was going
> on by then.  So I felt like notice is out.  People were aware.  And I
> knew that when I quit–I mean, I'm not a fool.  I knew that when I quit
> that it would raise a lot of eyebrows.

(Id. at 61-62.)  After leaving USACM, Rondeau went back to his former law firm, Goold

Patterson.  (Id. at 50.)  Goold Patterson continued to do work for USACM after Rondeau

left USACM and joined Goold Patterson, and Rondeau did not tell Goold Patterson the

reasons he left USACM.  (Id. at 152.)  In sum, when confronted with evidence of fraud,

Rondeau resigned.  He did not inform anyone about the suspected fraud.  In fact, although

he thought people were aware of the situation and his resignation would raise eyebrows, he

did not tell anyone at Goold Patterson about the fraud, and his new firm continued to

perform services for USACM.

Even if a reasonable jury could find that Rondeau would have acted to stop the

fraud, there is no evidence he had any corporate authority to do so.  Rondeau testified that

USACM was completely dominated by Hantges and Milanowski.  To the extent Rondeau

had any authority, it was limited to signing documents on Hantges' and Milanowski's

behalf, with their permission, "of course."  Rondeau's inconsistent statements that he would

have told regulatory authorities also do not raise an issue of fact that the unity between

USACM and Hantges and Milanowski should be severed.  As stated previously with respect

to other alleged innocent decision makers, the fact that Rondeau would have told outside

parties about the fraud does not suggest that Rondeau had any authority within the corporate

structure to stop the fraud, and instead suggests the opposite.  The fact that third party

regulatory agencies may have stepped in to stop the fraud if Rondeau blew the whistle does

not raise an issue of fact that Hantges and Milanowski were not the sole relevant actors at

USACM.

1   Ron Hilson was USACM's chief financial officer.  (Blunschi Decl., Ex. CC at
2   13-14.)  Hilson discovered that some borrowers were in arrears, that USACM was holding
3   checks owed to DTDF to cover the interest payments on non-performing loans, and that
4   USACM was paying the DTDF checks in increments as cash became available.  (Id. at 44-
5   46.)  Although Hilson testified he did not consider these irregularities fraud, upon learning
6   this information, Hilson told Garth McBride ("McBride"), whose company, Beadle
7   McBride, was auditing DTDF.  (Id. at 46-47, 80.)  Hilson asked McBride whether there was
8   anyone else he should report this to and McBride told him no, to let McBride investigate,
9   and McBride would let the appropriate people know.  (Id. at 46-47.)

10   Hilson testified that if he had known of fraudulent activity at USACM he would
11   have informed "whoever was appropriate."  (Id. at 53, 205.)  When asked if he would have
12   done anything to stop fraud at USACM had he become aware of it, Hilson testified that he
13   did not think he had power to stop a fraud, but he would have made it known so other
14   people who had the power to stop it could do so.  (Id. at 60.)  However, Hilson was not "in
15   a position to fire anybody or force any internal controls.  I mean, as–as much as I made
16   suggestions to [Milanowski] and [Loob], they fell on deaf ears."  (Id. at 60.)  Hilson did not
17   consider himself a member of senior management and was never a shareholder or director.
18   (Id. at 89, 93.)  According to Milanowski, Hilson had no authority to override decisions
19   made by Hantges and Milanowski.  (Blunschi Decl., Ex. K at 45-46.)  Hilson testified he
20   did not know if he would have told FID, and if Deloitte had informed him of a fraud, he
21   would assume that Deloitte would tell the appropriate people.  (Blunschi Decl., Ex. CC at
22   62-63.)

23   Hilson's testimony does not raise an issue of fact as to whether he was an
24   innocent decision maker who could and would have stopped the fraud if he had become
25   aware of it.  Hilson testified he lacked any power to stop a fraud at USACM, and any efforts
26   he made at instituting internal controls fell on deaf ears.  Hilson's testimony that he would

have informed unidentified individuals of fraud does not raise an issue of fact.  Moreover, even assuming Hilson was referring to regulatory or law enforcement agencies, or even the outside auditor McBride, Hilson's resort to blowing the whistle to third parties does not demonstrate a lack of unity between USACM and Hantges and Milanowski, as discussed previously with respect to other alleged innocent decision makers.

Phillip Dickinson was USACM's vice president of investments and a loan officer.  (Beatty Decl., Ex. X at 16.)  Dickinson was not on the board, had no managerial role, could not call a meeting, could not remove a director, and could not stop Hantges or Milanowski from taking corporate actions or from withdrawing funds.  (Blunschi Decl., Ex. EE at 47-49.)  Dickinson could not recall anyone overriding a decision by Hantges or Milanowski.  (Id. at 49.)

Dickinson testified that if he had learned of fraud or illegal activity at USACM, he would have told Hamilton, who was stockholder at that time, Buckley, or the state or federal securities regulatory agencies.  (Id. at 89-91, 93.)  Dickinson testified that he had some concerns that the 10-90 loan was fraudulent because it violated the prospectus, and he discussed the issue with Hantges and Milanowski.  (Decl. of Melanie Blunschi in Support of Mot. for Summ. J. (Causation) (Doc. #114), Ex. 37 at 55-56; Blunschi Reply Decl., Ex. AAA at 55-56.)  Hantges and Milanowski advised him they would take care of it.  (Blunschi Reply Decl., Ex. AAA at 55-56.)  Dickinson testified that he believed Hantges and Milanowski, and he did not tell anyone else about his concerns over the 10-90 loan.  (Id.)  Specifically, Dickinson did not tell FID, the SEC, or other investors of his concerns.  (Id. at 96-97.)

As with the other USACM employees, Dickinson's testimony demonstrates he had no corporate authority to stop the fraud, and the most he could or would have done was report the fraud to others.  As stated previously, an employee's whistle blowing to third parties does not raise an issue of fact that the wrongdoing agents are not the sole relevant

actors for the principal corporation.  Moreover, when confronted with actual suspicions of fraud, Dickinson did not report it to anyone other than the perpetrators of the fraud, and then accepted their assurances that the matter would be resolved.

Devin Lee was vice president of permanent financing.  Lee testified he did not have authority to remove a member of the board, initiate an investigation, call a shareholders meeting, remove Hantges or Milanowski, prevent Hantges or Milanowski from taking corporate actions, or prevent Hantges or Milanowski from withdrawing funds from USACM.  (Blunschi Decl., Ex. DD at 22-23.)  Lee testified that if he had learned of fraud at USACM, he would have told the FID.  (Beatty Decl., Ex. Y at 37.)  As with Dickinson, Lee had no actual corporate authority to stop the fraud and his testimony that he would have blown the whistle by telling FID does not raise an issue of fact that Hantges and Milanowski were not USACM's sole relevant actors.

The Trust's reliance on FID as an innocent party that could and would have stopped the fraud untethers the innocent decision maker exception from its moorings entirely.  The FID is an entity outside of and separate from USACM.  That it could and would stop fraud brought to its attention provides no insight into whether Hantges and Milanowski were USACM's sole relevant actors.  Moreover, it would eviscerate the sole actor rule because one could always point to an outside regulator or law enforcement agency that could and would stop a fraud.  The fact that a third party could and would stop the fraud has no bearing on the relevant question of whether the sole actor rule applies.

Finally, the Trust argues the Court should conclude that Nevada would follow a recent decision by the Pennsylvania Supreme Court and hold that an outside auditor cannot rely on imputation where the auditor does not act in good faith.  In Official Committee of Unsecured Creditors of Allegheny Health Education and Research Foundation v. PriceWaterhouseCoopers, LLP, the Pennsylvania Supreme Court noted that because imputation rules "justly operate to protect third parties on account of their reliance on an

agent's actual or apparent authority," imputation should not apply "where both the agent and the third party know very well that the agent's conduct goes unsanctioned by one or more of the tiers of corporate governance."  989 A.2d 313, 336 (Pa. 2010).  That court considered it "ill-advised, if not perverse" to charge the principal corporation "with knowledge as against a third party whose agents actively and intentionally prevented those in [the corporation's] governing structure who were non-participants in the fraud from acquiring such knowledge."  Id.  Thus, where an outside auditor engages in "secretive, collusive conduct" with corporate agents, Pennsylvania denies the colluding auditor the ability to rely on an imputation defense.  Id.

Nevada has not addressed whether it would adopt such a rule.  Even if Nevada were inclined to follow the Pennsylvania Supreme Court, that court indicated that such a rule would not apply where the wrongdoing agent with whom the auditor colluded is the sole actor:

> Were the action between a corporation controlled by a single individual and a sole-proprietor auditor, there would be a good case to be made that in pari delicto should apply to negate all causes of action arising out of intentional auditor misrepresentations made at the behest of the owner, and thus, with full corporate complicity.  At the very least, in the absence of some countervailing social policy at stake, the business can be deemed to have exposed itself to a just, judicial determination whether or not to simply leave the equally culpable parties in the condition in which they are found.

Id. at 331 (quotation and alteration omitted).  Because the sole actor rule applies here, and any intentional misrepresentations made by Deloitte would have been made with USACM's full complicity through Hantges and Milanowski, imputation still would be an available defense for Deloitte, even if Nevada followed the Pennsylvania Supreme Court.[3]

///

---

[3]  Further the Pennsylvania Supreme Court's requirement that the auditor act in good faith creates a double standard.  USACM's innocent stakeholders would be able to avoid having the bad faith conduct of USACM's agents imputed to USACM, but Deloitte's innocent stakeholders would have no such opportunity.

1       The Trust has failed to present evidence raising a genuine issue of material fact

2   that Hantges' and Milanowski's conduct should not be imputed to USACM.  Having

3   granted Hantges and Milanowski unfettered control over every aspect of USACM's

4   business, USACM cannot now disavow its agents' knowledge and conduct committed in

5   the course and scope of their employment.  The Court therefore will consider whether

6   Hantges' and Milanowski's knowledge and conduct bar the Trust's claims under either the

7   in pari delicto doctrine, the statute of limitations, or both.

8   **IV.  IN PARI DELICTO**

9       In pari delicto is a doctrine which generally provides that "[i]n case of equal fault

10  the condition of the party defending is the better one."  Kardoh v. United States, 572 F.3d

11  697, 700 (9th Cir. 2009) (quotation omitted).  It has been recognized as an affirmative

12  defense which "prohibits plaintiffs from recovering damages resulting from their own

13  wrongdoing."  Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006).  The doctrine

14  generally arises out of the theory that courts should not become involved in resolving

15  disputes among wrongdoers, but instead should leave them where their own wrongdoing

16  has left them.  Id.  Denying judicial relief to a wrongdoer "is an effective means of deterring

17  illegality."  Id. (quotation omitted).

18      The Trust contends that the Court should not apply the in pari delicto defense

19  against it here because doing so would not serve the policies underlying the doctrine, and

20  other public policy considerations favor dispensing with the defense under these

21  circumstances.  Specifically, the Trust argues that because the wrongdoers have been

22  removed from USACM, and any recovery will inure to the benefit of USACM's innocent

23  creditors rather than to any of the wrongdoers, the purposes of the doctrine no longer are

24  implicated by allowing the Trust to recover from Deloitte.

25      This Court previously has rejected this argument.  As the Court explained in In re

26  Agribiotech, the commencement of a bankruptcy proceeding creates an estate, and the

bankruptcy trustee is required to marshal all of the estate's property for the estate's benefit. 11 U.S.C. §§ 541(a), 704.  Pursuant to 11 U.S.C. § 541(a), property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  Id. § 541(a)(1).  This includes causes of action.  H.R. Rep. 95-595, 95th Cong., 1st Sess. 367-68 (1977); S. Rep. 95-989, 95th Cong., 2d Sess. 82-83 (1978).  A bankruptcy trustee stands in the debtor's shoes and "take[s] no greater rights than the debtor himself had."  H.R. Rep. 95-595, 95th Cong., 1st Sess. 367-68 (1977); S. Rep. 95-989, 95th Cong., 2d Sess. 82-83 (1978); see also Bank of Marin v. England, 385 U.S. 99, 101 (1966) ("The trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted against the bankrupt but for the filing of the petition.").  Accordingly, an equitable defense is as good against a bankruptcy trustee as it would have been against the debtor as of the commencement of the bankruptcy case as a matter of federal law.  Thus, the relevant question is not whether the Trust is in equal fault with Deloitte, but whether USACM is.

Moreover, as the New York Supreme Court observed, the equities in this type of situation are not "quite so obvious":

> In particular, why should the interests of innocent stakeholders of corporate fraudsters trump those of innocent stakeholders of the outside professionals who are the defendants in these cases?  The costs of litigation and any settlements or judgments would have to be borne, in the first instance, by the defendants' blameless stakeholders; in the second instance, by the public.

Kirschner, 938 N.E.2d at 958.  The Trust's argument effectively would create a "double standard" by permitting USACM's innocent shareholders and creditors to evade having their corporate wrongdoers' knowledge and conduct imputed to them, while Deloitte's innocent shareholders and creditors would have no such opportunity.  Id.

The Court therefore will evaluate whether Nevada would bar the Trust's claims against Deloitte pursuant to the in pari delicto doctrine.  Nevada recognizes the defense of

in pari delicto, but has cautioned courts applying Nevada law not to be "so enamored with the latin phrase 'in pari delicto' that they blindly extend the rule to every case where illegality appears somewhere in the transaction." Shimrak v. Garcia-Mendoza, 912 P.2d 822, 826 (Nev. 1996) (quotation omitted). The Nevada Supreme Court has outlined when use of the rule is appropriate:

> "The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, [1] the public cannot be protected because the transaction has been completed, [2] where no serious moral turpitude is involved, [3] where the defendant is the one guilty of the greatest moral fault and [4] where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied."

Id. (quoting Magill v. Lewis, 333 P.2d 717, 719 (1958)).

No genuine issue of material fact remains that USACM is the one guilty of the greatest moral fault. Once Hantges' and Milanowski's conduct and knowledge is imputed to USACM, USACM as originator of the fraud is at least as guilty as its negligent auditor or its aider and abetter. See In re Dublin Secs., Inc., 133 F.3d 377, 380 (6th Cir. 1997) (stating that where the debtors perpetrated a fraud on their investors, such purposeful conduct made the debtors at least as culpable as the attorneys who knew or should have known of the fraud but failed to apprise the businesses of those illegalities); cf. Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 313 (1985) (stating that in insider trading context, the Court could not say that "a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place").

Because the defense of in pari delicto applies against the Trustee with equal force as it would apply against USACM itself as of the commencement of bankruptcy proceedings, the Trustee is barred from recovering from Deloitte. The Court therefore will grant Deloitte's motion for summary judgment on all claims.

///

## V. STATUTE OF LIMITATIONS

For a bankruptcy petitioner like USACM, 11 U.S.C. § 108(a) extends the applicable limitations period up to an additional "two years after the order for relief," but only if the limitations period has "not expired before the date of the filing of the petition." USACM filed bankruptcy on April 13, 2006. Consequently, if USACM's claims against Deloitte expired under the applicable statute of limitations prior to that date, the Trust's claims are barred.

Pursuant to Nevada Revised Statutes § 11.2075,

> 1. An action against an accountant or accounting firm to recover damages for malpractice must be commenced within:
>> (a) Two years after the date on which the alleged act, error or omission is discovered or should have been discovered through the use of reasonable diligence;
>> (b) Four years after completion of performance of the service for which the action is brought; or
>> (c) Four years after the date of the initial issuance of the report prepared by the accountant or accounting firm regarding the financial statements or other information, whichever occurs earlier.
> 2. The time limitation set forth in subsection 1 is tolled for any period during which the accountant or accounting firm conceals the act, error or omission upon which the action is founded and which is known or through the use of reasonable diligence should have been known to the accountant or the firm.

Under Nevada law, a breach of fiduciary duty claim is akin to fraud and is subject to the three-year statute of limitation set forth in Nevada Revised Statutes § 11.190(3)(d). Nev. State Bank v. Jamison Family P'ship, 801 P.2d 1377, 1382 (Nev. 1990). Because the Trust alleges Deloitte aided and abetted Hantges' and Milanowski's breaches of their fiduciary duties to USACM, the claim does not arise out of Deloitte's fiduciary duties as auditor. As a result, the three-year statute of limitations in § 11.190(3)(d) applies to the Trust's aiding and abetting claim, rather than § 11.2075's rules regarding accounting malpractice claims. See Stalk v. Mushkin, 199 P.3d 838, 844 (Nev. 2009) (holding that three-year fraud limitations period applies where aiding and abetting breach of fiduciary claim arises out of relationship other than attorney-client relationship); In re NM Holdings Co., LLC, 622 F.3d

31

at 626-27 (noting that corporation had an interest in having officer properly perform his

fiduciary duties, which is "different from the interest harmed in a professional-negligence

claim," and thus aiding and abetting claim was not governed by malpractice limitations

period).

Here, Deloitte completed the fiscal year 2000 audit on June 28, 2001. (Blunschi

Decl., Ex. D.) Thus, even if Hantges' and Milanowski's conduct was not imputed to

USACM, the four-year limitations period under § 11.2075(1)(c) expired on June 28, 2005,

before USACM filed for bankruptcy. Any malpractice claim based on the 2000 audit

therefore is barred.

As for the fiscal year 2001 audit, Deloitte completed it on November 26, 2002.

(MSJ ¶ 2.) Because Hantges' and Milanowski's knowledge is imputed to USACM,

USACM was aware of Deloitte's alleged malpractice and aiding and abetting no later than

November 2002. USACM's malpractice claims therefore expired in November 2004 under

§ 11.2075(1)(a), and its aiding and abetting claim expired in November 2005 under

§ 11.190(3)(d). Because these claims expired before USACM filed for bankruptcy, the

Trust cannot resurrect them post-petition.

The Trust argues that two tolling provisions save its claims. First, the Trust

argues Deloitte fraudulently concealed its conduct, and thus the limitations period was

tolled pursuant to § 11.2075(2) until Deloitte's misconduct was uncovered in the

bankruptcy proceedings. However, Deloitte could not fraudulently conceal Hantges' and

Milanowski's conduct from USACM because once Hantges' and Milanowski's knowledge

is imputed to USACM, Deloitte's alleged malpractice and aiding and abetting were known

to USACM at the time they occurred in 2001 and 2002.

Further, the evidence the Trust relies upon to show fraudulent concealment does

not raise an issue of fact that Deloitte fraudulently concealed its alleged misconduct from

USACM. The Trust relies upon Deloitte issuing clean audit opinions, but courts generally

hold that to invoke fraudulent concealment to toll the limitations period, something more than the underlying act is required.  See Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1416 (9th Cir. 1987).  Rather, the plaintiff must show "affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief."  Id. at 1415-16 (quotation omitted) (stating that mere "silence or passive conduct does not constitute fraudulent concealment").

The Trust also relies on Deloitte withdrawing from future engagements as USACM's auditor.  However, withdrawing from future engagements does not conceal Deloitte's conduct in past audits, and does nothing to mislead USACM as to whether it had a cause of action against Deloitte.  Finally, the Trust contends Deloitte assuaged FID's concerns related to the $7 million in withheld checks from DTDF.  Assuming the evidence supports a finding that Deloitte took affirmative steps to assuage FID's concerns on this issue, that Deloitte may have taken acts to conceal something from FID does not raise an issue of fact that Deloitte fraudulently concealed anything from USACM.

Finally, the Trust contends that the doctrine of adverse domination tolls the limitations period.  "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers."  Resolution Trust Corp. v. Farmer, 865 F. Supp. 1143, 1151 (E.D. Pa. 1994) (citing 3A Fletcher Cyclopedia § 1306.20).  "The doctrine is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control."  Id.

Nevada has not indicated whether it would adopt the adverse domination doctrine.  However, even if it would, application of the doctrine would reinforce this Court's prior determination that Hantges and Milanowski completely dominated and controlled USACM such that imputation and in pari delicto would apply.  See Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873, 879 (9th Cir. 1984) ("A plaintiff who seeks

to toll the statute because the corporation was dominated must show full, complete and exclusive control in the directors or officers charged." (quotation omitted)); <u>Wilson v. Paine</u>, 288 S.W.3d 284, 287 (Ky. 2009) (noting that the adverse domination doctrine is "rooted in long-established principles of agency law," and arises out of the adverse interest exception). To show adverse domination, the Trust would have to "effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue." <u>Mosesian</u>, 727 F.2d at 879; <u>see, e.g.</u>, <u>Wilson</u>, 288 S.W.3d at 289 (holding the defendant must show "there was someone who had the knowledge, the ability and the motivation to bring suit during the period of corporate control"; if no such person exists the corporation was adversely dominated); <u>Resolution Trust Corp. v. Grant</u>, 901 P.2d 807, 819 (Okla. 1995) (same); <u>Resolution Trust Corp. v. Farmer</u>, 865 F. Supp. 1143, 1157 (E.D. Pa. 1994) (holding a plaintiff "must negate the possibility that an informed person or persons could have induced the corporation to initiate suit"). The Trust's claims therefore are barred by the statute of limitations.

**VI. CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Deloitte & Touche LLP's Motion for Summary Judgment (Imputation, In Pari Delicto, and Statute of Limitations) (Doc. #97) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendant Deloitte & Touche LLP's Motion to Exclude Certain Opinions and Testimony of Colin Johns (Doc. #110) is hereby DENIED as moot.

IT IS FURTHER ORDERED that Defendant Deloitte & Touche LLP's Motion for Summary Judgment (Causation) (Doc. #111) is hereby DENIED as moot.

///

///

///

1         IT IS FURTHER ORDERED that Judgment is hereby entered in favor of

2   Defendant Deloitte & Touche LLP, and against Plaintiff USACM Liquidating Trust.

4   DATED: February 16, 2011

                                                      _____

                                                     PHILIP M. PRO

                                      United States District Judge